# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Meshetnaglee S., | Case No. 18-cv-759 (HB) |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew Saul, Commissioner of Social Security, | |
| Defendant. | |

Dana W. Duncan, Duncan Disability Law, S.C., 555 Birch Street, Nekoosa, Wisconsin 54457; and Jennifer G. Mrozik, Hoglund, Chwialkowski & Mrozik, PLLC, for Plaintiff Meshetnaglee S.

Elvi D. Jenkins, Social Security Administration, 1301 Young Street, Dallas, Texas 75202, for Andrew Saul, Commissioner of Social Security

HILDY BOWBEER, United States Magistrate Judge[1]

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Meshetnaglee S. seeks judicial review of

a final decision by the Commissioner of Social Security, denying his applications for

social security disability insurance benefits (DIB) and supplemental security income

(SSI). The matter is before the Court on the parties' cross-motions for summary

judgment [Doc. Nos. 13, 15]. For the reasons set forth below, the Court denies Plaintiff's

motion for summary judgment and grants the Commissioner's motion for summary

judgment.

---

[1] The parties have consented to have a United States Magistrate Judge conduct all proceedings in this case, including the entry of a final judgment.

## I.     Procedural Background

Plaintiff applied for DIB and SSI on July 25, 2016, alleging disability which began on November 10, 2014. (*See* R. 19.)[2] The claims were denied on January 19, 2016, and denied again on reconsideration on February 6, 2017. (*Id.*) Plaintiff requested a hearing to review the denial of his claims on March 1, 2017. (*Id.*) On August 10, 2017, an administrative law judge ("ALJ") held a hearing wherein Plaintiff and David Russell, a vocational expert, appeared and testified. (*Id.*) The ALJ analyzed Plaintiff's claims under the Social Security Administration's five-step sequential evaluation procedure. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The ALJ issued a written opinion on October 6, 2017, finding that Plaintiff was not disabled under § 216(i) and 223(d) of the Social Security Act. (R. 21–34.)

At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since November 10, 2014, the alleged date of disability onset. (R. 21.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: hearing loss on the right side, headaches, obesity, degenerative disc disease, left hip sclerosis, major depression, borderline personality disorder, posttraumatic stress disorder, and panic disorder. (R. 22.) However, at step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1. (R. 22–25.)

At step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC").

---

[2] The Social Security Administrative Record ("R.") is available at Doc. No. 12. When citing to this record, the Court uses the document's native pagination.

(R. 25–33.)  As part of that assessment, the ALJ analyzed whether the intensity, persistence, and limiting effects of Plaintiff's symptoms were as severe as he claimed. (R. 26–27, 29.)  The ALJ also analyzed and assigned evidentiary weight to three medical sources who opined on Plaintiff's RFC. (R. 29–32.)  Two of these sources were treating sources (Dr. Kirk Mueller, Ph.D., and Dr. Brandon Dugan, Psy.D), and one opinion was from a non-treating Social Security Administration consultant, Dr. Donald Wiger, Ph.D. (*Id.*)  Ultimately, the ALJ relied on the opinions of two non-examining, non-treating agency physicians, and based his RFC assessment on their opinions, with modifications derived from the ALJ's findings.  (R. 32.)

The ALJ concluded Plaintiff could perform medium work with some excluded tasks, which were enumerated in detail.[3]  The ALJ found that Plaintiff was capable of simple, routine, repetitive tasks with occasional, brief, and superficial contact with coworkers, supervisors, and the public.  (R. 25.)  The ALJ noted that Plaintiff had no past relevant work and therefore did not determine the transferability of his job skills.  (R. 33.)

At step five, the ALJ considered the limitations impeding Plaintiff's RFC as well as his age, education, and work experience.  (R. 33–34.)  Turning to the testimony of the vocational expert, the ALJ concluded that Plaintiff could successfully adjust to work

---

[3]  The ALJ excluded the following tasks from Plaintiff's RFC: lifting, carrying, pushing, and pulling loads fifty pounds or more (occasionally) or twenty-five pounds (frequently); sitting, standing, and walking for periods of six to eight hours each; climbing ladder, ropes, or scaffolds; climbing ramps and stairs frequently; balancing, stooping, kneeling, crouching, and crawling frequently; and any work at unprotected heights, moving mechanical parts, with exposure to sharp objects, or in a moderate noise environment. (R. 25.)

including positions such as packager, assembler, and cleaner. (*Id.*) Because those positions exist in significant numbers in the national economy, the ALJ decided that Plaintiff was not disabled. (*Id.*) Plaintiff sought review by the Appeals Council, which denied her request. (R. 3.) The ALJ's decision therefore became the final decision of the Commissioner. (*See* R. 3.)

In this action for judicial review, Plaintiff contends that the ALJ did not afford appropriate weight to the treating source opinions during step four of the analysis. (Pl.'s Br. Supp. Mot. Summ. J. at 15–34 [Doc. No. 14].)[4] Plaintiff argues that the ALJ improperly discounted the opinions of Drs. Mueller, Dugan, and Wiger, and afforded disproportionate weight to the opinions of non-examining state agency physicians. (*Id.* at 15–16.)

## II.    Medical Background

The Court has reviewed the entire administrative record, and given particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

During the relevant time period, Plaintiff received medical care at three locations: the Mayo Clinic in Austin, Minnesota; Sioux Trails Mental Health Center; and Eunoia Family Resource Center in Mankato, Minnesota

---

[4] When citing to the parties' memoranda, the Court uses CM/ECF pagination.

### A.    Mayo Clinic

At the Mayo Clinic, Plaintiff was first seen by Joanne M. McGaffey, a certified nurse practitioner, on November 3 and 17, 2014, for a musculoskeletal injury he claimed to have incurred at work.  (R. 419–23.)  Initial examination found an abnormal gait and paraspinous tenderness to palpation without signs of radiculopathy.  (R. 421–23.)  X-ray studies showed "trace" degenerative disc disease, which the radiologist reported to be common in asymptomatic patients.  (*Id.*)  On follow up, McGaffey noted Plaintiff reported improvement, and his physical examination showed improvement as well. (R. 419–20.)

Plaintiff's psychological illness was first noted on January 29, 2016, by Dr. Bryan M. Cairns, M.D., a family practitioner.  (R. 415–18.)  Dr. Cairns noted Plaintiff engaged in self-harm ("cutting") in the past year after several fights with his father.  (*Id.*)  However, Dr. Cairns reported Plaintiff's mental status examination was largely normal.  (*Id.*)  Repeat x-ray studies of his left hip and left knee were unchanged since 2012 and remained within normal limits.  (R. 417–18.)

On February 17, 2016, Plaintiff treated with Dr. Alberto Marcelin, M.D., a family practitioner.  (R. 406–08.)  Plaintiff discussed many complaints with Dr. Marcelin.  (*Id.*)  In addition, Plaintiff's significant other reported odd behavior, specifically, that he had recently been "giggly."  (*Id.*)  Due to Plaintiff's history of cutting and childhood meningitis, Dr. Marcelin ordered consultation with psychiatry and neurology and started him on an antidepressant.  (*Id.*)

Plaintiff was seen by a psychiatrist, Dr. Fatma Reda, M.D., on March 7, 2016.

(R. 398–400.)  She noted a past history of "non-serious" suicide attempts prior to 2010, "very superficial" self-injurious behavior, depression, post-traumatic stress disorder, and anxiety.  (*Id.*)  Plaintiff's depressive symptoms were improving after three weeks on fluoxetine, however, and his mental status examination was grossly normal.  (*Id.*)  Dr. Reda ordered an increased dose of antidepressants and a Millon Clinical Multiaxial Inventory-III ("MCMI-III") to further assess Plaintiff's psychological condition.  (*Id.*)  Dr. Kirk H. Mueller, Ph.D., a psychologist, administered the MCMI-III on April 6, 2016; the results were confounded, however, by exceedingly high scores suggestive of "self-depreciation" and "vulnerability."  (R. 397.)  On April 6, 2016, Dr. Reda continued to report a normal mental status examination but noted self-reported agitation that she attributed to an increased antidepressant dose.  (R. 395–96.)

Plaintiff received psychotherapeutic care from Dr. Mueller on three occasions between May 2, 2016, and July 12, 2016.  (R. 385, 388, 392.)  Dr. Mueller's mental status examinations noted marginal grooming with body odor, depressed mood with congruent affect, intact insight and judgment, and thoughts of self-harm without suicidal ideation or intent.  (*Id.*)  Dr. Mueller opined that Plaintiff's thoughts of self-harm were secondary to family trauma and caring for his significant other who suffered from depression.  (R. 388.)  Dr. Mueller observed improvement with psychotherapeutic and medical interventions.  (R. 386.)  Dr. Mueller completed a medical source statement on October 30, 2016.  (R. 429–30.)

On June 8, 2016, Plaintiff saw Dr. Marcelin for worsening symptoms of depression over the prior three to four days that he attributed to a complicated

relationship with his significant other.  (R. 387.)  Dr. Marcelin recommended

hospitalization, but Plaintiff refused.  (*Id.*)  Shortly thereafter, Plaintiff was seen in the

emergency department.  Following an argument with his girlfriend he made "superficial"

cuts on his right arm and had a panic attack.  (R. 376.)  The emergency department

physician noted "appropriate mood [and] affect, [and] normal judgment."  (R. 379.)  He

elaborated that Plaintiff "looks ok[ay], he is smiling, has good eye contact . . . [and] does

not feel suicidal."  (R. 380.)

On follow up, Dr. Marcelin noted that Plaintiff had been noncompliant with his

Zoloft regimen; therefore, Dr. Marcelin changed his antidepressant course.  (R. 386).

On August 3, 2016, Plaintiff's girlfriend reported his mood had improved with the new

antidepressant.  (R. 383–84.)

On September 7, 2016, Plaintiff saw another family medicine practitioner,

Dr. Kristen L. Holland, M.D., to request disability documentation.  (R. 441–43.)  When

asked why he was disabled, Plaintiff answered it is "probably . . . related to his

psychiatric diagnoses."  (R. 442.)  Dr. Holland declined to provide a medical source

opinion given Plaintiff was just establishing care with her.  (R. 445.)  Dr. Holland

reported that Plaintiff's depression began in 2011. (R. 442.)  She found his psychological

symptoms were related to his living situation with his parents.  (*Id*.)  Plaintiff reported

being unemployed after August, 2016, when he moved to Saint Peter, Minnesota.  (*Id.*)

While living in St. Peter he continued to work at his family's store.  (*Id.*)  Dr. Holland's

psychiatric examination revealed neutral mood and affect.  (*Id.*)  On follow up,

Dr. Holland observed a normal affect, and recommended that Plaintiff disentangle

himself from his "toxic family" relationships. (R. 434–35.)

Plaintiff saw Dr. Holland on three more occasions from September 2016 to April 2017 for a variety of complaints including pain and numbness, gastrointestinal symptoms, and a cough. (R. 447–50, 541–44, 545–47.) During this time, he began treating at Sioux Trails Mental Health Center. Plaintiff consistently reported only occasional alcohol use throughout his time at the Mayo Clinic. (*See, e.g.*, R. 443.)

### B. Sioux Trails Mental Health Center

Plaintiff treated at Sioux Trails Mental Health Center from October 2016 through February 2017. (R. 459–73.) During that time he was seen by psychologist Dr. Mark E. Kleiman, Ph.D., on ten occasions, and psychiatrist Dr. Nora Bammidi, M.D., twice. (*Id.*) Dr. Kleiman noted that Plaintiff's euthymic mood was incongruent with the severity of his subjective symptoms. (R. 470.) Plaintiff reported binge drinking until he blacked out. (*See, e.g.*, R. 464, 467.) Dr. Kleiman consistently reported improvement with psychotherapy. (R. 463, 468.) He also observed that Plaintiff started seeking mental health care around the time of his DIB application. (*See* R. 462.)

Dr. Kleiman repeatedly attributed exacerbations in Plaintiff's anxiety, self-harm, and depression to family stressors including confrontations with his father and his girlfriend. (*See* R. 463, 466.) Dr. Kleiman noted symptoms of sleep disturbance, hyperactivity, and aggression associated with changes in medication; however, he did not observe any other symptoms of mania. (R. 458, 463.) Plaintiff reported "black out[s]" lasting less than one hour; these events occurred approximately three times per month. (R. 462.)

Dr. Bammidi observed Plaintiff's symptoms did not support a diagnosis of mania or hypomania; she observed that Plaintiff's subjective impression of "fe[eling] mania . . . sound[ed] more like anxiety." (R. 535.) Dr. Bammidi diagnosed Plaintiff with borderline personality disorder. (*Id.*) Dr. Bammidi's mental status examination noted normal speech, memory, knowledge, associations, affect, knowledge, and gait. (*Id.*) She also observed fair dressing and grooming with unwashed clothes as well as good eye contact and cooperation. (*Id.*)

## C.    Eunoia Family Resource Center

Plaintiff began mental health care with Dr. Brandon Dugan, Psy.D., on April 4, 2017. (R. 505.) Dr. Dugan noted symptoms of multiple psychiatric disorders based on a screening questionnaire that Plaintiff had completed. (*Id.*) On mental status examination, Dr. Dugan observed Plaintiff to be appropriately dressed with adequate grooming and hygiene, and good eye contact. (R. 508.) However, Plaintiff was malodorous, had a sad or depressed mood with a flat or blunted affect, had poor impulse control, and had suicidal and homicidal ideation "with no intent or plan." (*Id.*) Dr. Dugan diagnosed Plaintiff with bipolar I disorder. (R. 510.) Dr. Dugan noted that, as a priority, Plaintiff could benefit most from stable and healthy housing. (*Id.*) Dr. Dugan made no changes to Plaintiff's medication regimen. (R. 511.) Dr. Dugan also had Plaintiff complete an Adaptive Behavior Assessment System II ("ABAS-II") form, which suggested extremely low-range adaptive behavior in all measured categories except for "functional academics." (R. 523.) Dr. Dugan examined Plaintiff again on April 17, 2017. (R. 576–79.) All objective signs were unchanged from his initial examination. (R. 565–66.) On

April 24, 2017, Dr. Dugan completed a medical source form for the Social Security Administration.  Dr. Dugan saw Plaintiff four additional times in May 2017.[5]

## III.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision.  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Davidson v. Astrue*, 578 F.3d 838, 841 (8th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)), meaning that less than a preponderance of the evidence is needed to meet the standard, *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).  The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently.  *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).  In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability.  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  To meet the definition of disability for DIB purposes, the claimant must establish that he is unable "to engage in any substantial gainful activity by reason of

---

[5]  All of Dr. Dugan's progress notes from May 2017 are identical copies of his note from April 17, 2017.

any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The same standard applies to SSI claims. See 42 U.S.C. § 1382c(a)(3)(A). The disability, not just the impairment, must have lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## IV.   Discussion

Plaintiff claims that the ALJ erred in assessing the contribution of his mental health to his RFC, resulting in the denial of his disability claim. An RFC assessment is an administrative determination regarding the extent to which a claimant is capable of performing work-related activities given the claimant's impairments. *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007). The Commissioner determines the claimant's RFC by conducting "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," Social Security Ruling ("SSR") 96-8p, 1996 WL 362207 (S.S.A. July 2, 1996), and the end product measures the "most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).

Plaintiff contends the ALJ erred in discounting three medical source opinions when assessing his RFC. Plaintiff argues the ALJ improperly gave only partial weight to the medical report by treating medical source Dr. Mueller. (*Id.* at 23.) Plaintiff also argues the ALJ erred when he gave minimal weight to the opinions of Dr. Dugan, a treating medical source, and Dr. Wiger, an examining medical source. Plaintiff submits the ALJ improperly based his decision on the opinions of non-treating, non-examining

agency psychological consultants instead.

Generally, examining medical sources are given more weight than non-examining medical sources. 20 C.F.R. § 404.1527(c)(1).[6] Further, the opinion of a treating medical source should be considered controlling if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ may deviate from this rule, however, if he supplies good reason for doing so. *Id.* The ALJ may also consider the consistency of the source's opinion with the record as a whole when assigning weight to that opinion. 20 C.F.R. § 404.1527(c)(4).

Plaintiff argues that because the opinions of Drs. Mueller, Dugan, and Wiger are consistent with each other, the ALJ could not find that they were inconsistent with the record as a whole. (Pl.'s Br. Supp. Mot. Summ. J. at 16.) Further, Plaintiff claims that "[n]othing in the ALJ's decision evidences any attempt to comply with the relevant law as it pertains to the weight to be afforded" to source opinions. (*Id.* at 12.) By contrast, the Commissioner contends that the ALJ's recitation of inconsistencies between the source opinions and "the entire record" was sufficient to discount those opinions. (Def.'s Mem. Supp. Mot. Summ. J. at 6.)

The governing regulations "do not strictly require the ALJ to explicitly discuss each factor under 20 C.F.R. § 404.1527(c)." *Mapson v. Colvin*, No. 14-CV-1257 (SRN/BRT), 2015 WL 5313498, at *4 (D. Minn. Sept. 11, 2015) (internal quotation and

---

[6] Substantively identical regulations for SSI claims are promulgated in 28 U.S.C. § 416.927.

brackets omitted); *cf.* 20 C.F.R. § 404.1527(f)(2).  On the contrary, the ALJ must only

"explain the weight given to opinions from these sources or otherwise ensure that the

discussion of the evidence in the determination or decision allows a claimant or

subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an

effect on the outcome of the case."  20 C.F.R. § 404.1527(f)(2).  "While it may [be]

preferable for the ALJ to discuss a [medical opinion] in more depth," the conclusions

drawn from a medical opinion are valid if "there is substantial evidence in the record

supporting the ALJ's finding."  *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012).

As discussed in detail below, the Court concludes that the ALJ did not err in discounting

the opinions of Drs. Mueller, Dugan, and Wiger.

###### A.      Plaintiff's Subjective Complaints

The ALJ discounted the opinions of Dr. Dugan and Dr. Mueller in part because

they were based on Plaintiff's subjective complaints, and the ALJ found that Plaintiff's

subjective complaints were not consistent with the medical and other evidence of record.

Plaintiff argues that the ALJ did not consider the medical evidence that corroborates his

subjective complaints.

In *Craig v. Apfel*, the Eighth Circuit found that an ALJ "may discount [a]

physician's opinion that is based on discredited subjective complaints."  212 F.3d 433,

436 (8th Cir. 2000) (citing *Gaddis v. Chater*, 76 F.3d 893, 895–96 (8th Cir. 1996)).  "An

ALJ who rejects [subjective] complaints must make an express credibility determination

explaining the reasons for discrediting the complaints."  *Singh v. Apfel*, 222 F.3d 448,

452 (8th Cir. 2000).  "The absence of an objective medical basis which supports the

degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." *Wagner v. Astrue*, 499 F.3d 842, 844 (8th Cir. 2007). Other factors include the claimant's daily activities; work history; intensity, duration, and frequency of symptoms; side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also* SSR 16-3p, 2016 WL 1119029, at *2 (S.S.A. Mar. 16, 2016). The ALJ need not explicitly discuss each factor, *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005), however, and a court should defer to the ALJ's findings when the ALJ expressly discredits the claimant and provides good reasons for doing so, *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990).

Here, the ALJ made two express determinations regarding Plaintiff's subjective complaints: first, concerning Plaintiff's "musculoskeletal complaints," and second, concerning his "mental health impairments." (R. 26–27, 29.) As to the former, the ALJ found that the claimed intensity, persistence, and limiting effects of Plaintiff's musculoskeletal complaints were not consistent with clinical findings, course of treatment, use of medication, and work history and motivation for work. (R. 26–27, 32–33.) These findings are well-supported by the record. X-rays studies of his left knee, left hip, and spine were normal. (R. 367, 382, 417–18, 423, 439–40.) An MRI of the cervical spine showed no nerve root impingement or stenosis. (R. 485.) Range of motion was normal or only slightly impaired. (R. 369–71, 422.) All four extremities were normal in tone, bulk, and strength. (R. 484.) Gait, base, and stride were also normal. (R. 383.) Leg and hip pain were managed with ibuprofen and acetaminophen. (R. 417.)

Back and neck pain were managed with conservative care such as intermittent use of ibuprofen, stretching, and heat and ice therapy. (R. 419.) Although Plaintiff contends his symptoms were exacerbated by work, multiple providers associated his symptoms with social tensions with his family and girlfriend. (R. 376–82, 387, 388, 415–18, 463, 467, 469–72.) The ALJ also noted that Plaintiff's earnings did not decline after the onset of his alleged disability. (R. 32, 244–45.) Rather, his earnings declined after he moved to Saint Peter, Minnesota, and left his job as an assistant manager at Midwest Theaters and Odyssey Entertainment in Maple Grove, Minnesota. (*Id.*) Plaintiff also gave conflicting reports to his providers concerning his work at a family store, and one physician indicated he was working "under the table." (R. 434, 436, 438, 441–43.) Work restrictions were not warranted. (R. 419.)

As to Plaintiff's subjective complaints related to mental health, the ALJ found those complaints were not as severe or limiting as Plaintiff claimed, given his "intermittent treatment with sporadic counseling, sporadic psychiatric presentation, one emergency department presentation in which [Plaintiff] generally denied acute concerns, and intermittent medication use." (R. 29.) Looking at the record as a whole, the Court finds substantial evidence to support these findings. First, the objective medical evidence did not fully substantiate the alleged severity of Plaintiff's subjective complaints. (*E.g.*, R. 470, 473.) An examination during his only emergency department visit showed non-acute symptoms of anxiety. (R. 376–81.) His mood and affect were appropriate, and his judgment was normal. (R. 379.) Similarly, Plaintiff's providers frequently described his symptoms as mild, and mental status examinations were generally normal. (R. 385, 395–

96, 398–400, 415, 420, 429.)  Plaintiff did not take his medications as prescribed (R. 376, 383, 387), but reported his medication was effective when he took it (R. 385).  Plaintiff's providers and girlfriend agreed his symptoms improved when he complied with his medication regimen.  (R. 383–84, 386.)  Plaintiff also failed to attend therapy appointments regularly (*e.g.*, R. 429), but responded well to therapy and made progress when he did. (R. 463, 468.)  On one occasion, Plaintiff's provider noted that his euthymic mood was incongruent with his reported symptoms and activities, possibly reflective of a "reporter's bias."  (R. 470.)  And, as already noted above, although Plaintiff claimed his disability impaired his ability to work, the decline in his earnings was not coincident with the onset of his alleged disability but with his decision to leave his job and move to another city.

In Plaintiff's favor, the record also contains evidence that Plaintiff's subjective complaints—including symptoms of anxiety, depression, self-injurious behavior, post-traumatic stress disorder, psoriasis, and joint pain—have remained relatively consistent.  But where two different conclusions can be drawn from the evidence—one of which supports the Commissioner's decision—a reviewing court must affirm the Commissioner's decision.  *See, e.g.*, *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Court concludes that the record contains substantial evidence to support the ALJ's determination that Plaintiff's subjective symptoms were not as severe as claimed and that the ALJ properly took this into account when weighing the opinions of the medical sources.

## B.    Dr. Mueller's Opinion

Dr. Mueller submitted a medical source statement on October 30, 2016.  (R. 429–30.)  Dr. Mueller had treated Plaintiff three times prior to writing the source opinion, but had not seen Plaintiff since July 12, 2016.  (*Id*.)  Dr. Mueller opined that symptoms of depression impaired Plaintiff's ability to perform complex tasks and that Plaintiff was "struggling with demands, [and] responsibilities . . . [and] he would not succeed in responding to [work pressure, supervision and co-workers]."  (*Id.*)

The ALJ gave only partial weight to Dr. Mueller's report because "the claimant saw Dr. Mueller only three times and he appears to rely on subjective reports."  (R. 30.) Nevertheless, based in part upon Dr. Mueller's report, the ALJ "reduce[d] the complexity of work tasks and the intensity and frequency of social contacts."  (*Id.*)

Plaintiff argues the ALJ erred in partially discounting Dr. Mueller's opinions and in failing to provide good reason for doing so.  Further, Plaintiff argues that the ALJ's rationale for discounting Dr. Mueller's report "lacks the logicality necessary[] for this [C]ourt to find that a reasonable mind might accept those conclusions."  (Pl.'s Reply Br. at 13.)  The Commissioner responds that the ALJ provided valid reasons to give partial weight to Mueller's report and supported those reasons with substantial evidence from the record.

The Court finds that the ALJ did not err in assigning partial weight to Dr. Mueller's opinion.  "[T]he ALJ may reject the conclusions of any medical expert, whether hired by a claimant or by the government, if inconsistent with the medical record as a whole."  *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995) (citation omitted); *cf.*

*Holmstrom v. Massanari*, 270 F.3d 714, 720 (8th Cir. 2001) (finding an ALJ may discount a treating physician's opinion "if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions.")  Under the pertinent regulations, a medical opinion may be given less weight if the length of the treatment relationship is brief or if the "medical source fails to provide relevant evidence to support a medical opinion." 20 C.F.R. § 404.1527(c).  Relevant evidence includes "medical signs and laboratory findings." 20 C.F.R. § 404.1527(c).  Furthermore, an ALJ may discount a medical source opinion that is founded on a claimant's subjective complaints when those complaints are not corroborated by objective medical evidence. *See, e.g.*, *Teague v. Astrue*, 638 F.3d 611, 615–16 (8th Cir. 2011) (finding an ALJ properly discounted a medical source because it "cited only limitations based on subjective complaints, not . . . objective findings).

In his report, Dr. Mueller lists the following objective medical signs to support his opinion:

> Casual attire with marginal hygiene and grooming noted.
> Significant body odor.  Mood and affect a bit depressed.
> No evidence of psychotic symptoms.  No report of assaultive,
> homicidal, or suicidal ideation[,] intent[, or] plan. . . .  Insight and
> judgment adequate. . . .  In addition, no awkward mannerisms, motor
> movement intact although gait appeared a bit labored.

(R. 429.)  The language used in Dr. Mueller's report suggests that the remaining symptoms discussed are merely recitations of Plaintiff's subjective reports, not

Dr. Mueller's professional opinion.[7]  (R. 429–30.)  When Dr. Mueller reported Plaintiff's limitations, he relied exclusively on these subjective reports, not on his own objective findings. Further, Dr. Mueller's assessment is equivocal, stating he "would question" Plaintiff's ability to complete complex tasks, and he "believe[s]" Plaintiff could not handle the responsibilities of work.  (*Id.*)  Dr. Mueller's report is further eroded by his limited contact with Plaintiff.  Dr. Mueller explicitly acknowledges the limitations of his opinion: because he had seen Plaintiff only three times as a treating medical provider, he acknowledges he cannot opine on the consistency of Plaintiff's symptoms, prognosis, or response to treatment.  (*Id.*)

The Court finds that the ALJ did not err in partially discrediting Dr. Mueller's opinion, and that substantial evidence supports the ALJ;s decision to give lower weight to the opinion.

Plaintiff next argues that the ALJ failed to provide any support for his conclusion that limiting the complexity of work tasks and intensity and frequency of social contacts adequately addressed Dr. Mueller's conclusions.  (Pl.'s Br. Supp. Mot. Summ. J. at 24.) Specifically, Plaintiff notes that the ALJ only addressed "the level of complexity of the work" not "work stress."  (*Id.*)  The Eighth Circuit has held that when examining whether an unskilled entry level job would minimize nonexertional work-related stresses, vocational or psychological testimony is required.  *Sanders v. Sullivan*, 983 F.2d 822,

---

[7]  For example, Dr. Mueller writes Plaintiff "*has reported* [stays] at home quite a bit" and "*describes* difficulty connecting with others"; and "*patient described* limited ability to persist at routine tasks or ability to finish them due to anhedonia, low energy, [and] poor concentration."  (R. 429–30 (emphases added).)

823–24 (8th Cir. 1992). Further, "[t]estimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994) (citation omitted). However, the hypothetical does not need to encompass alleged limitations that the ALJ has properly discredited. *Randolph v. Barnhart*, 386 F.3d 835, 841–42 (8th Cir. 2004).

Here, the ALJ discounted those portions of Dr. Mueller's report that were based on subjective complaints alone. (R. 30.) The ALJ then reduced both work complexity and social contacts, noting he "cannot find additional restrictions in that the claimant saw Dr. Mueller only three times and he appears to rely on subjective reports."[8] (*Id.*) The ALJ's opinion clearly suggests that he did not include work stress restrictions because Dr. Mueller based his opinion on few contacts with Plaintiff and only the alleged work stress limitations were exclusively supported by discredited subjective complaints. Because the alleged work stress limitations were properly discounted by the ALJ, the Court finds he was not required to obtain vocational testimony regarding work stresses.

### C. Dr. Dugan's Opinion

After treating Plaintiff on two occasions, Dr. Dugan completed a medical source

---

[8] In full, the ALJ wrote:

> Dr. Mueller equivocally opines that the claimant could handle simple but not complex instructions but could not tolerate work pressure, supervisors and coworkers. I reduce the complexity of work tasks and the intensity and frequency of social contacts based in part on this report but cannot find additional restrictions in that the claimant saw Dr. Mueller only three times and he appears to rely on subjective reports.

(R. 30.)

form on April 24, 2017.  (R. 572–79.)  On that form he listed the following diagnoses:

"Bipolar I Disorder, Borderline Personality Disorder, PTSD, [and] Unspecified

Dissociative Disorder."  (R. 524–32.)  Dr. Dugan completed a checklist of symptoms and

cited the ABAS-II inventory Plaintiff had previously completed to describe the severity

of impairments.  (*Id.*)  When asked to provide a medical sign of impairment, Dr. Dugan

wrote, "untreated [b]ipolar disorder with alternating manic and depressive episodes,

flashbacks, [and] dissociation." (*Id.*)

The ALJ assigned Dr. Dugan's opinion minimal weight given its inconsistency

with the record as a whole.  (R. 31–32.)  Dr. Dugan relied almost exclusively on

Plaintiff's self-reports.  The ALJ found no evidence that Dr. Dugan reviewed prior

treatment notes, and thus his opinion concerning Plaintiff's impairments before his

treatment of Plaintiff began was not supported by any medical evidence.  Further,

Dr. Dugan's diagnosis of dissociative disorder was not supported by any medical

evidence of record, and Dr. Dugan's opinion contained internal inconsistencies that

eroded its credibility.  (*Id.*)

The Court finds substantial evidence to support the ALJ's assessment of

Dr. Dugan's opinion.  First, while there is some evidence that Dr. Dugan did look to prior

medical reports from Plaintiff's treatment at Sioux Trails Mental Health Center, it does

not appear that this review was exhaustive.  For example, Dr. Dugan did not address

previous providers' findings that Plaintiff lacked classical medical signs of mania, and his

manic symptoms seemed to be related to his medication.  (R. 462, 533–536.)  Further,

Dr. Dugan did not acknowledge Dr. Bammidi's findings that Plaintiff's self-described

manic symptoms are in fact the symptoms of situational anxiety. (R. 535.) Nor did he address Plaintiff's history of binge drinking alcohol and blacking out due to alcohol intoxication which was discussed at length in Dr. Keilman's notes. (R. 462, 464, 467.)

Dr. Dugan pointed to no objective medical signs that could suggest new diagnoses of bipolar disorder and unspecified dissociative disorder; in fact, he pointed to no objective medical signs at all. Indeed, Dr. Dugan's opinion relies heavily on a symptom screener completed by Plaintiff. (R. 505.)

In addition, Dr. Dugan's opinion that Plaintiff had "unmedicated [b]ipolar disorder with alternating manic and depressive episodes, flashbacks, [and] dissociation" (R. 526) is inconsistent with Dr. Dugan's prior treatment notes where he made no changes to Plaintiff's medications to treat his bipolar disorder (*see, e.g.*, R. 510). Further, looking elsewhere in the record, multiple providers expressly did not endorse diagnoses of mania or hypomania, attributed symptoms of mania to medication changes, and diagnosed Plaintiff's self-reported mania as anxiety. (*See, e.g.*, R. 458, 535.)

Plaintiff argues the ALJ erred by not considering his low ABAS-II inventory scores. Dr. Dugan relied exclusively on the ABAS-II inventory to inform his opinion on Plaintiff's adaptive functioning level. (R. 524.) The ABAS-II inventory "measures ten different adaptive function areas." *Ortiz v. United States*, 664 F.3d 1151, 1159 (8th Cir. 2011). The ABAS-II inventory is based on self-reported subjective complaints that are scored and interpreted by a medical provider; it is not objective clinical evidence itself. *See generally* Thomas Oakland & Patti L. Harrison, *Adaptive Behavior Assessment System-II: Clinical Use and Interpretation* 43–45 (2008). The Eighth Circuit has warned

that assessments like the ABAS-II should not be relied upon in a vacuum but must be considered "in conjunction with evidence of record." *Ortiz*, 664 F.3d at 1163.

Here, the objective evidence of record suggests that Plaintiff's true adaptive function was not captured by the ABAS-II, and the ABAS-II results are internally inconsistent with Dr. Dugan's own findings. Dr. Dugan describes Plaintiff as being cooperative, with good eye contact. (R. 508.) Other providers noted he engaged in conversations and communicated appropriately in a clinical setting. (*See, e.g.*, R. 483.) His thought content was consistently appropriate and his behavior was non-bizarre. (R. 508, 524.) His grooming and self-care were observed to be adequate. (*Id.*) Further, his earnings did not diminish significantly following the alleged date when his disability began. (R. 244–45.)

In sum, the Court finds the ALJ did not err by discounting Dr. Dugan's opinion. The ALJ provided good reasons, supported by substantial evidence of record, to discount Dr. Dugan's opinion.

### D.     Dr. Wiger's Opinion

In December 2015, Dr. Wiger conducted a Social Security psychological examination of Plaintiff. (R. 362–65.) At the time of the examination, Plaintiff was not taking medication or being treated by a medical provider. (R. 362.) On examination, Dr. Wiger found slow movements without evidence of psychomotor disorder. (R. 363–64.) He also described distractibility, limited concentration, and monotonous speech. (*Id.*) However, Dr. Wiger also noted that Plaintiff appeared to be in good health, was able to participate in normal activities of daily living, was "somewhat relaxed," held

appropriate conversation, and kept eye contact appropriately.  (*Id.*)  Nevertheless, based on his examination and the medical record from the Mayo Clinic, Dr. Wiger concluded Plaintiff "is not able to carry out work-like tasks with reasonable persistence and pace on a continued basis. . . . [and] is not able to handle the stressors of a[] full-time work environment."  (R. 364–65.)

After summarizing Dr. Wiger's findings, the ALJ assigned Dr. Wiger's opinion minimal weight because Plaintiff "was not treated at that time and Dr. Wiger saw the claimant on only one occasion."  (R. 29.)  Plaintiff argues this reason is legally insufficient to discount Dr. Wiger's opinion, especially given the ALJ's great reliance on non-examining, non-treating agency physicians.  By contrast, the Commissioner points to the short length of the patient-provider relationship and concerns that Dr. Wiger's examination was less informative because Plaintiff was not taking medication during the time period when the examination took place.

The Court agrees that the ALJ gave minimal reasons for discrediting Dr. Wiger's opinion.  However, the two reasons articulated by the ALJ—lack of a treatment relationship and lack of support—are valid reasons to discount a medical opinion.  *See* 20 C.F.R. § 404.1527(c)(2), (3).  Furthermore, the Eighth Circuit has held that omitting specific reasons for discounting testimony "is not fatal to the ALJ's decision [if] the same evidence support[s] discounting" other testimony.  *Wheeler v. Apfel*, 224 F.3d 891, 896 (8th Cir. 2000) (finding an ALJ did not err in not listing specific reasons for discrediting a claimant's husband where the same reasons already identified for discrediting the claimant would also apply to the husband).  "[W]hile it is preferable that the ALJ

delineate the specific credibility determinations for each witness, an arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome." *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992).

Here, the ALJ's failure to provide more reasons for discounting Dr. Wiger's opinion is, at most, harmless error. First, like the opinions of Drs. Mueller and Dugan, Dr. Wiger's opinion provides no objective evidence to support his assertion that Plaintiff "is not able to carry out work-like tasks" or handle the stresses of full-time employment.

Second, the error was harmless because substantial evidence supports the ALJ's ultimate decision to deny Plaintiff's claim. For example, Plaintiff continued to work without a decline in pay after the alleged onset of disability. (R. 244–45.) After he voluntarily left his job, he continued to work at his family's store. (R. 442.) Plaintiff testified that he was able to walk and swim for recreation but did not engage in those activities for financial reasons, not because he was disabled. (R. 54.). Objective medical signs suggest incongruities between Plaintiff's subjective complaints and his actual level of disability. (*See, e.g.*, R. 470.). Further, multiple providers attributed exacerbations in his symptoms to stressors at his home, not at work. (*See, e.g.*, R. 387, 388, 463, 467.) The Eighth Circuit has held that such situational illnesses are inconsistent with disability. *See, e.g.*, *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) (finding that a claimant's depression was nondisabling because, *inter alia*, her "depression was situational"); *cf. Mance v. Shalala*, 16 F.3d 1228 (8th Cir. 1994) (concluding an ALJ's finding of situational anxiety required no further evaluation by a consulting psychiatrist).

Moreover, Plaintiff declined recommended hospitalization and was non-compliant with a prescribed medication.  (R. 386–87.)  Failure to follow prescribed treatment plans has been held to be inconsistent with a disabling impairment.  *Tuttle v. Barnhart*, 130 F. App'x 60, 61 (8th Cir. 2005) ("[T]he ALJ properly discredited Tuttle based on her failure to comply with recommended treatment."); *see also Dunahoo*, 241 F.3d at 1039.

Relatedly, Plaintiff and his significant other reported long periods of improving symptoms with medications, and his psychologists reported objective improvement with psychotherapy.  (R. 383–84, 463, 468.)  Indeed, the mental status examinations of multiple providers over extended periods of time were generally within normal limits: documenting good health, adequate grooming, self-care, knowledge, and engagement with his physician.  (*See, e.g.*, R. 535.)  Plaintiff argues these notations are evidence of the fluctuating nature of his disease, not improvement with treatment.  The Eighth Circuit has ruled that the fluctuating natural history of some life-long illnesses is not inconsistent with a finding of disability.  *See, e.g.*, *Johnson v. Astrue*, 628 F.3d 991, 993 (8th Cir. 2011) (discussing the natural history of systemic lupus erythematosus); *cf. Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better . . . does not imply that the condition has been treated.")  Here, however, Plaintiff's presentation was clinically mild and fluctuations in his mental health appeared related to compliance with medication and consistent psychotherapy, not the natural history of his illness.

In sum, Dr. Wiger's opinion had the same flaws as the opinions of Drs. Mueller

and Dugan, and the ALJ's ultimate disability determination is supported by substantial

evidence. Therefore, the ALJ's failure to provide additional reasons for discounting

Dr. Wiger's opinion was harmless error.


Accordingly, based on all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. Plaintiff Meshetnaglee S.'s Motion for Summary Judgment [Doc. No. 13]

   is **DENIED**; and

2. Defendant Andrew Saul's Motion for Summary Judgment [Doc. No. 15] is

   **GRANTED**.


Dated: August 27, 2019

 s/ *Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge